## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ATLAS DATA PRIVACY CORPORATION, et al., | |
| Plaintiffs, | Civil Action No.: 24-cv-04261 |
| vs. | |
| EQUIMINE, INC., et al., | |
| Defendants. | |
| ATLAS DATA PRIVACY CORPORATION, et al., | |
| Plaintiffs, | Civil Action No.: 24-cv-04292 |
| vs. | |
| MELISSA DATA CORPORATION, et al., | |
| Defendants. | |
| ATLAS DATA PRIVACY CORPORATION, et al., | |
| Plaintiffs, | Civil Action No.: 25-cv-01535 |
| vs. | |
| INNOVATIVE WEB SOLUTIONS, LLC, et al., | |
| Defendants. | |

**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

*Attorneys for Plaintiffs*

**PEM LAW LLP**
Rajiv D. Parikh
Kathleen Barnett Einhorn
Jessica A. Merejo
One Boland Drive, Suite 101
West Orange, New Jersey 07052
Telephone (973) 577-5500
Emails: rparikh@pemlawfirm.com
        keinhorn@pemlawfirm.com
        jmerejo@pemlawfirm.com

**BOIES SCHILLER FLEXNER LLP**
Adam Shaw (admitted *pro hac vice*)
30 South Pearl Street, 12th Floor
Albany, New York 12207
Telephone: (518) 434-0600
Email: ashaw@bsfllp.com

Mark C. Mao (admitted *pro hac vice*)
Julia Bront (admitted *pro hac vice*)
44 Montgomery Street, 41st Floor
San Francisco, California 94104
Telephone: (415) 293-6800
Email: mmao@bsfllp.com
        jbront@bsfllp.com

James Lee (admitted *pro hac vice*)
100 SE Second Street, Suite
2800 Miami, Florida 33131
Telephone: (305) 357-8434
Email: jlee@bsfllp.com

Eric Palmer (admitted *pro hac vice*)
401 E. Las Olas Blvd., Suite 1200
Fort Lauderdale, Florida 33301
Telephone: (954) 377-4250
Email: epalmer@bsfllp.com

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ..................................................................1

ARGUMENT ..........................................................................................3

I.    JURISDICTIONAL DISCOVERY PROVES THAT DEFENDANTS ARE SUBJECT TO SPECIFIC PERSONAL JURISDICTION IN NEW JERSEY..................................................................................3

    A.    The Court Should Analyze Jurisdiction Under the Traditional Purposeful Availment Test....................................................4

    B.    Personal Jurisdiction is Established Under the *Calder* Effects Test. 7

        1.    Daniel's Law is An Intentional Tort................................9

        2.    Plaintiffs Felt the Harm in New Jersey.........................13

        3.    Defendants Expressly Aimed Their Conduct at New Jersey ..17

II.  DEFENDANT-SPECIFIC JURISDICTIONAL SHOWINGS ..................20

    A.    Melissa Data................................................................. 20

        1.    Jurisdiction Exists Under the Traditional Purposeful-Availment Test......................................................................20

        2.    Jurisdiction Exists Under the *Calder* Effects Test .................23

            i.    Melissa Data Acted Intentionally .....................................23

            ii.    Melissa Data Knew the Plaintiffs Felt the Brunt of the Harm in New Jersey.......................................................25

            iii.    Melissa Data Admits it Expressly Aimed its Conduct at New Jersey ..................................................................26

    B.    Equimine................................................................................27

        1.    Jurisdiction Exists Under the Traditional Purposeful-Availment Test......................................................................27

        2.    Jurisdiction Exists Under the *Calder* Effects Test .................30

            i.    Equimine Acted Intentionally .......................................30

            ii.    Equimine Knew the Plaintiffs Felt the Brunt of the Harm in New Jersey ..........................................................31

            iii.    Equimine Expressly Aimed its Conduct at New Jersey32

    C.    Innovative ........................................................................33

        1.    Jurisdiction Exists Under the Traditional Purposeful-Availment Test......................................................................33

        2.    Jurisdiction Exists Under the *Calder* Effects Test .................36

            i.    Innovative Acted Intentionally......................................36

i

ii.    Innovative Knew the Plaintiffs Felt the Brunt of the
Harm in New Jersey ......................................................38

iii.    Innovative Admits it Expressly Aimed its Conduct at
New Jersey ...................................................................39

III.    DEFENDANTS CANNOT SHOW THAT EXCERCISING
JURISDICTION IS UNCONSTIUTIONAL. .....................................41

CONCLUSION ..............................................................................42

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                                                          <u>Page(s)</u>

*Ameripay, LLC v. Ameripay Payroll, Ltd*.,
   334 F.Supp.2d 629 (D.N.J. 2004) .......................................................................... 3

*Atlas Data Priv. Corp. v. Constella Intelligence, Inc.*,
   ESX-L-007212-24 (October 2, 2025) ............................................................... 2, 7

*Atlas Data Privacy Corp. v. We Inform, LLC*,
   758 F.Supp.3d 322 (D.N.J. 2024) ......................................................... 10, 11, 12

*Bove v. AkPharma, Inc*.,
   213 A.3d 948 (N.J. App. Div. 2019) ...................................................................... 8

*Briskin v. Shopify, Inc.*,
   135 F.4th 739 (2025) ................................................................................... Passim

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985) .................................................................................... Passim

*Calder v. Jones*,
   465 U.S. 783 (1984) .................................................................................... Passim

*CoachSource, LLC v. Coachforce*,
   Civ. No. 17-5126, 2019 U.S. Dist. LEXIS 51561(D.N.J. Mar. 27, 2019) ............. 6

*Counterman v. Colorado*,
   600 U.S. 66 (2023) ................................................................................................ 9

*Cox Broadcasting Corp. v. Cohn*,
   200 S.E.2d 127 (Ga. 1973) ................................................................................ 11

*Delong v. PHE, Inc*.,
   No. CV 24-5212, 2025 WL 2447787 (E.D. Pa. Aug. 25, 2025) .......................... 12

*Doe v. Celebrity Cruises, Inc*.,
   394 F.3d 891 (11th Cir. 2004) .............................................................................. 9

*Dun & Bradstreet, Inc.*,
   472 U.S. 749 (1985) ............................................................................. 9

*Espinosa v. Holloway*,
   No. 07 C 50009, 2007 WL 9821255 (N.D. Ill. Sept. 28, 2007).......................... 12

*Food Sci. Corp. v. Nagler*,
   Civil No. 09–1798 (JBS), 2010 WL 1186203 (D.N.J. Mar. 22, 2010) ............... 35

*Ford Motor Co. v. Montana Eighth Judicial Dist. Ct.*,
   592 U.S. 351 (2021) ......................................................................Passim

*Gertz v. Robert Welch, Inc.*,
   418 U.S. 323 (1974) ............................................................................. 9

*Goldfarb v. Kalodimos*,
539 F. Supp. 3d 435 (E.D. Pa. 2021) ................................................Passim

*Hasson v. FullStory, Inc.*,
   114 F.4th 181 (3d Cir. 2024)............................................................Passim

*Hankins v. Doubletree Management, LLC*,
 Civ. No. 19-8698, 2022 U.S. Dist. LEXIS 134989 (D.N.J. July 29, 2022) ........... 6

*Hawks v. Seery*,
   2023 WL 5206135 (D. Ariz. Aug. 14, 2023)........................................... 12

*Hepp v. Facebook*,
   14 F.4th 204 (3d Cir. 2021)............................................... 4, 20, 27, 33

*Johnson v. Griffin*,
   85 F.4th 429 (6th Cir. 2023) ...........................................................Passim

*Marten v. Godwin*,
   499 F.3d 290 (3d Cir. 2007)............................................................... 16

*Massie v. Gen. Motors Co.*,
   2021 WL 2142728 (E.D. Cal. May 26, 2021) ...................................... 20

iv

*Mavrix Photo, Inc.*,
   647 F.3d 1218 ............................................................................... 26, 32, 39

*Mellon Bank (East) PSFS v. Farino*,
   960 F.2d 1217 (3d Cir. 1992) ................................................................. 3, 40

*M.H. & J.H. v. Omegle.com, LLC*,
   Civ. No. 20-11294, 2021 U.S. Dist. LEXIS 52427 (D.N.J. Mar. 19, 2021) ........ 6

*Rasmussen v. Saliba*,
   2018 WL 11362716 (S.D.N.Y. Jan. 24, 2018) ........................................... 9

*Reetz v. Advocate Aurora Health, Inc.*,
   983 N.W. 2d 669 (Wis. App. 2022) ........................................................ 11

*Remick v. Manfredy*,
   238 F.3d 248 (3d Cir. 2001) ................................................................... 7

*Romaine v. Kallinger*,
   537 A. 2d 284 (N.J. 1988) .................................................................... 11

*Schnur v. JetBlue Airways Corp.*,
   2024 WL 2816552 (W.D. Pa. June 3, 2024) .............................................. 20

*Tayts v. Gacutan*,
   WL 125199 (N.D. Cal. Jan. 16, 2026) ..................................................... 11

*Toys "R" Us, Inc. v. Step Two, S.A.*,
   318 F.3d 446 (3d Cir. 2003) ............................................................. Passim

*Venuto v. Atlanstis Motor Group*, LLC,
   2018 WL 2134035 (D.N.J. May 9, 2018) .................................................... 5

*Vonbergen v. Liberty Mut. Ins. Co.*,
   705 F. Supp. 3d 440 (E.D. Pa. 2023) ........................................................ 7

*Walden v. Fiore*,
   571 U.S. 277 (2014) ...................................................................... 4, 24, 30

*Will Co., Ltd. v. Lee*,
 47 F.4th 917 (9th Cir. 2022) ................................................................. 9

## **Statutes**

N.J.S.A. 56:8-166.1(a)(1) ........................................................................ 18

N.J.S.A. 56:8-166.1(d)(3) ........................................................................ 8

N.J.S.A. 56:8-166.3 ................................................................................. 13

## **Other Authorities**

77 C.J.S. Right of Privacy and Publicity § 32 ........................................ 11

## PRELIMINARY STATEMENT

Defendants' jurisdictional arguments rest on the false premise that because they offer data services nationwide or globally, they are subject to personal jurisdiction nowhere specifically. The law states the opposite. Personal jurisdiction does not turn on how broadly a defendant markets its services, but on whether the defendant deliberately engaged in forum-connected conduct or expressly aimed and knew the resulting harm would be felt there. Courts therefore look at what the defendant did, what it knew about the wrongful activity and its effects, and whether it purposefully availed itself of the forum by directing its conduct at forum residents.

Discovery has confirmed exactly what Plaintiffs alleged: Defendants Equimine, Melissa Data, and Innovative purposefully availed themselves of the New Jersey forum by systematically collecting, exploiting, and monetizing New Jersey residents' protected information as part of their ordinary course of business. Defendants' own witnesses admitted that their platforms publish New Jersey home addresses and phone numbers; that New Jersey residents and businesses regularly access and pay for their services; that Defendants track, analyze, and profit from New Jersey-based users and data; and that New Jersey constitutes a meaningful and recurring source of revenue. Those deliberate, forum-directed activities establish the minimum contacts required for specific jurisdiction under the traditional purposeful-availment framework.

1

The same evidence independently satisfies the *Calder* effects test. Defendants further testified that they understood the nature of Daniel's Law nondisclosure requests; that those requests specifically identified New Jersey covered persons; that disclosure of home addresses and phone numbers implicates personal privacy and safety rights; and that Defendants nevertheless made conscious decisions not to remove or suppress that information after notice. In doing so, Defendants intentionally engaged in forum-directed conduct they knew would cause harm to New Jersey residents in New Jersey. Indeed, New Jersey courts have already applied the *Calder* effects test to Daniel's Law cases specifically because it involves intentional conduct. The New Jersey Superior Court, on a motion to compel jurisdictional discovery, applied *Calder* and found that Daniel's Law "requires proof of **intentional act of disclosure**, receipt of nondisclosure requests, and disregard of those requests—mens rea requirements entirely consistent with intentional tort analysis." *See Atlas Data Priv. Corp. v. Constella Intelligence, Inc.*, ESX-L-007212-24 (October 2, 2025), at 3–5 (emphasis added).[1]

This is not a close case. Defendants deliberately built, marketed, and profited from data-driven businesses that depend on New Jersey residents, New Jersey data, and New Jersey customers. Under settled Supreme Court and Third Circuit

---

[1] Order Granting Plaintiffs' Motion to Compel Discovery Responses attached as Exhibit A to the declaration of Jessica A. Merejo ("Merejo declaration"), filed concurrently herewith.

precedent, personal jurisdiction plainly exists under both the traditional minimum-contacts analysis and the *Calder* effects test. Defendants' motions to dismiss should be denied.

## ARGUMENT

### I.  JURISDICTIONAL DISCOVERY PROVES THAT DEFENDANTS ARE SUBJECT TO SPECIFIC PERSONAL JURISDICTION IN NEW JERSEY

Federal courts analyze specific personal jurisdiction under a three-part test. ***First***, Plaintiffs must show that the defendant took "some act by which it purposefully avails itself of the privilege of conducting activities within the forum State." ***Second***, "[t]he plaintiff's claims…must arise out of or relate to the defendant's contacts with the forum." *Ford Motor Co. v. Montana Eighth Judicial Dist. Ct.*, 592 U.S. 351, 359 (2021) (quotation marks and citation omitted). ***Third***, if both threshold requirements are met, "the burden shifts to the defendant, who must show that the assertion of jurisdiction would be unreasonable.'" *Ameripay, LLC v. Ameripay Payroll, Ltd*., 334 F.Supp.2d 629, 633 (D.N.J. 2004) (citing *Mellon Bank (East) PSFS v. Farino*, 960 F.2d 1217, 1226 (3d Cir. 1992)); *Briskin v. Shopify, Inc.*, 135 F.4th 739, 751 (2025) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)).

The Third Circuit applies two complementary frameworks depending on the nature of the defendant's conduct: (i) the traditional purposeful availment test

3

articulated in *Ford*, 592 U.S. at 359; and (ii) the *Calder* effects test, derived from

*Calder v. Jones*, 465 U.S. 783 (1984). *See Hasson v. FullStory, Inc*., 114 F.4th 181,

187 (3d Cir. 2024).

The traditional test is used to obtain personal jurisdiction over out-of-state

defendants that have purposefully availed themselves of the privilege of conducting

activities within the forum and invoked the benefits and protections of the forum's

laws. *Id*. at 186. The *Calder* test is used to establish personal jurisdiction over out-

of-state defendants who, despite minimal contacts with the forum, cause intentional

harm there. *Id*. at 187.

**A. The Court Should Analyze Jurisdiction Under the Traditional Purposeful Availment Test.**

Under the traditional test for specific jurisdiction, the query is whether the

defendant had "minimum contacts with the forum state that show the defendant took

a deliberate act reaching out to do business in that state" that "give rise to—or relate

to—the plaintiff's claims." *Hepp v. Facebook*, 14 F.4th 204, 207 (3d Cir. 2021).

Plaintiffs "must show that the defendant deliberately 'reached out beyond' its

home—by, for example, 'exploi[ting] a market' in the forum State or entering a

contractual relationship centered there." *Ford*, 592 U.S. at 360 (quoting *Walden v.

Fiore*, 571 U.S. 277, 285 (2014)). In addition, Plaintiffs' claims "must arise out of

or relate to the defendant's contacts." *Id.* at 359. "The minimum contacts

requirement is satisfied so long as the contacts resulted from the defendant's

purposeful conduct and not the unilateral activities of the plaintiff." *Venuto v. Atlanstis Motor Group,* LLC, 2018 WL 2134035, at * 3 (D.N.J. May 9, 2018) (finding specific jurisdiction over defendant where it "solicit[ed] business and attempt[ed] to close a deal" with a New Jersey citizen by "email, telephone, and texts").

As the Supreme Court has explained, "even a single act can support jurisdiction," which "may not be avoided merely because the defendant did not *physically* enter the forum state." *Burger King*, 471 U.S. at 475 & n.18 (emphasis in original). Many courts have held that the solicitation of business from residents of a particular state, even if that solicitation occurs over the internet or the telephone, is sufficient to support the exercise of jurisdiction. *See, e.g.*, *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 452 (3d Cir. 2003) (if a web site operator "knowingly conducts business with forum state residents via the site, then the 'purposeful availment' requirement is satisfied").

Defendants' testimony—delineated below—establishes the necessary minimum contacts because each "purposefully avail[ed] itself of the privilege of conducting activities within the forum' and 'invoke[ed] the benefits and protections of [the forum's] laws.'" *Hasson*, 114 F.4th at 186 (quoting *Toys "R" Us*, 318 F.3d at 451). Defendants (a) collect data on New Jersey residents, including their home address and/or home phone number information (Compl. ¶ 40), procure data, in

5

many cases, from New Jersey public records (*id.* at ¶¶ 2, 40); (b) operate a website where that information is for sale to New Jersey customers (*see id.* at. ¶¶ 37–41), and/or (c) sell a product on the website containing that information.

Defendants cite *M.H. & J.H. v. Omegle.com, LLC*, Civ. No. 20-11294, 2021 U.S. Dist. LEXIS 52427, at *6 (D.N.J. Mar. 19, 2021) for the proposition that specific jurisdiction is not satisfied if a defendant merely operates a "generally accessible website that looks and operates the same for users across the word."[2]  This citation demonstrates Defendants' misunderstanding of Plaintiffs' argument.

First, Defendants do not merely operate websites that happened to be accessible to New Jersey residents, as in *Omegle* or *Coachsource*, nor do Defendants sell physical goods through an internet platform reachable from New Jersey, as in *Toys "R" Us* or *Hankins*.  Rather, Defendants affirmatively reached into New Jersey to collect New Jersey–specific data and then exploited that data for commercial gain through their websites and products.

Second, unlike *Hasson*, Plaintiffs' claims arise directly from—and are inseparable from—Defendants' New Jersey contacts.  The alleged injury stems from covered person information collected in New Jersey, made available on Defendants'

---

[2] Defendants also cite *Hankins v. Doubletree Management, LLC*, Civ. No. 19-8698, 2022 U.S. Dist. LEXIS 134989 (D.N.J. July 29, 2022) and *CoachSource, LLC v. Coachforce*, Civ. No. 17-5126, 2019 U.S. Dist. LEXIS 51561, at *11 (D.N.J. Mar. 27, 2019) for the same proposition.

websites, and sold to New Jersey residents. The websites and products at issue are therefore not incidental conduits for unrelated transactions, but the very means by which Defendants' New Jersey-directed harm occurred.

Third, the claims here are not triggered by the moment a website is accessed. Liability arises only after Defendants receive a New Jersey nondisclosure request and then knowingly fail to take any action within the ten-day statutory period. That post-notice, forum-directed conduct is what gives rise to Plaintiffs' claims and distinguishes this case from the authorities Defendants rely upon.

**B. Personal Jurisdiction is Established Under the *Calder* Effects Test.**

The Court should also consider whether personal jurisdiction is proper under the *Calder* test. *See Hasson*, 114 F.4th at 197 (stating that the district court should have analyzed jurisdiction under both the traditional test and *Calder* test). Under the *Calder* test, personal jurisdiction over a defendant is proper if the forum is the "focus" of the defendant's tortious conduct. *Hasson*, 114 F.4th at 187. Courts applying *Calder* evaluate whether "(1) the defendant committed an intentional tort; (2) the plaintiff felt the brunt of the harm in the forum; and (3) the defendant expressly aimed his tortious conduct at the forum." *Id.* (citing *Remick v. Manfredy*, 238 F.3d 248, 258 (3d Cir. 2001)).

"When a plaintiff claims that a defendant committed an intentional tort, the Court must consider whether jurisdiction is appropriate under the *Calder* effects

test." *Vonbergen v. Liberty Mut. Ins. Co.,* 705 F. Supp. 3d 440, 449 (E.D. Pa. 2023). Here, Defendants are alleged to have committed intentional torts aimed at a New Jersey resident with knowledge that the brunt of the harm would be felt in New Jersey. The facts demonstrate that Defendants are subject to personal jurisdiction under the *Calder* test.

Indeed, New Jersey courts have already recognized that Daniel's Law claims fall squarely within the *Calder* effects framework because they involve intentionality toward the forum. In ordering jurisdictional discovery, the New Jersey Superior Court held that Daniel's Law is not a strict-liability statute, but instead requires intentional acts of disclosure, receipt of nondisclosure requests, and disregard of those requests, rendering the statute "entirely consistent with intentional tort analysis" under *Calder*. *See Atlas Data Priv. Corp. v. Constella Intelligence, Inc.*, ESX-L-007212-24 (October 2, 2025), at 3–5[3] (applying *Calder* and holding that Daniel's Law "requires proof of ***intentional act of disclosure***, receipt of nondisclosure requests, and disregard of those requests—mens rea requirements entirely consistent with intentional tort analysis.") (emphasis added.).

---

[3] Order Granting Plaintiffs' Motion to Compel Discovery Responses attached as Exhibit A to the Merejo declaration, filed concurrently herewith.

### 1. Daniel's Law is An Intentional Tort

***First***, Daniel's Law creates an intentional tort because it "requires an intentional act of disclosure, though liability may be imposed for such a disclosure only if the defendant was negligent in reviewing and responding to received nondisclosure requests."[4]  As long as an element of liability requires intent, the tort is intentional, even if the mens rea or fault standard applicable to other elements does not require intent: "For example, a battery claim may be asserted based on 'any nonconsensual touching' and does not require intent to injure."  *Bove v. AkPharma, Inc.*, 213 A.3d 948, 960 (N.J. App. Div. 2019).

Defendants claim that Daniel's Law does not create an intentional tort because it requires only negligence and does not require a specific intent.  But by definition, "an intentional tort is [a] tort committed by someone acting with general or specific intent."  *Doe v. Celebrity Cruises, Inc.*, 394 F.3d 891, 917 (11th Cir. 2004); *see also* Intentional Tort, Black's Law Dictionary (12th ed. 2024) (same).  And courts have never restricted the effects test to the subcategory of intentional torts that require

---

[4] Daniel's Law defines "disclose" to mean "to solicit, sell, manufacture, give, provide, lend, trade, mail, deliver, transfer, post, publish, distribute, circulate, disseminate, present, exhibit, advertise, or offer, and shall include making available or viewable within a searchable list or database." N.J.S.A. 56:8-166:1(d)(3).  As Plaintiffs noted in their supplemental brief, "[v]irtually all of these acts inherently involve a knowing act of providing information to a third-party," and "even disclosure by 'making available' has to involve knowing acts of including information in a searchable database and granting a third-party access to that database." CA No. 24-04105-HB, Doc. 67 at 4–5.

9

specific "intent to accomplish a result or consequence of [an] act." *Will Co., Ltd. v. Lee*, 47 F.4th 917, 923 (9th Cir. 2022); *Rasmussen v. Saliba*, 2018 WL 11362716, at *4 n.1 (S.D.N.Y. Jan. 24, 2018) (same).

Indeed, if Defendants were right that the effects test requires specific intent, *Calder* itself was wrongly decided insofar as it predicated jurisdiction on a defamation claim. Defamation requires an intentional act of publication, but does not require specific intent to engage in false or defamatory speech—negligent or "reckless disregard of whether it was false or not" can suffice. *Counterman v. Colorado*, 600 U.S. 66, 76 (2023); *Dun & Bradstreet, Inc*., 472 U.S. 749, 763 (1985) (holding "actual malice" is not required "when the defamatory statements do not involve matters of public concern."); *Gertz v. Robert Welch, Inc*., 418 U.S. 323, 347 (1974) ("[S]o long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for…defamatory falsehood injurious to a private individual."). And because defamation claims are the paradigm case for jurisdiction under the effects test, at minimum, Daniel's Law claims qualify as intentional torts when premised on allegations that "defendants disregarded the law willfully or recklessly," as they are here. *Atlas Data Privacy Corp. v. We Inform, LLC*, 2025 WL 1787566, at *5 (D.N.J. June 27, 2025) (holding that the allegations of the Complaints are "sufficient to allege recklessness").

Defendants' claim this Court somehow already held that Daniel's Law does not create an intentional tort in ruling that it adopts a negligence standard of fault, misunderstands this Court's decision. Daniel's Law requires proof that a Defendant (i) received a nondisclosure request from a covered person; (ii) disclosed, re-disclosed, or otherwise made available that covered person's information more than ten business days later; and (iii) acted with "willful or reckless disregard of the law" (for punitive damages) or negligent disregard (for actual or liquidated damages). This Court held that element (iii) requires negligent indifference to a covered person's rights to impose actual or liquidated damages, just as it requires "'willful or reckless disregard of the law'" to impose "punitive damages." *Atlas Data Privacy Corp. v. We Inform, LLC*, 758 F.Supp.3d 322, 340-41 (D.N.J. 2024). The Court also ruled that "liability for actual or liquidated damages does not demand a showing of specific intent or of willful or reckless conduct." *Id.* at 340. But that conclusion is entirely consistent with the notion that Daniel's Law creates an intentional tort because it requires general intent to disclose or otherwise make available a covered person's information.

Indeed, interpreting Daniel's Law to require both an intentional act of disclosure and negligent, reckless, or willful disregard of a covered person's rights is in keeping with the Court's conclusion that the statute is "analogous to the common law tort of invasion of privacy of the intimate details of a person's life."

11

*Id.* at 341; *Reetz v. Advocate Aurora Health, Inc*., 983 N.W. 2d 669, 681 (Wis. App. 2022) ("[P]ublicity of private facts" is "an intentional tort"). "[T]his tort requires proof of 'the unreasonable publication of private facts.'" *We Inform*, 758 F.Supp.3d at 341 (*quoting Romaine v. Kallinger*, 537 A. 2d 284, 291-92 (N.J. 1988)). But the act of "disclosure must have been intentional." 77 C.J.S. Right of Privacy and Publicity § 32. Otherwise, the plaintiff need only show the defendant acted with "negligent disregard for the fact that reasonable men would find the invasion highly offensive." *Cox Broadcasting Corp. v. Cohn*, 200 S.E.2d 127, 131 (Ga. 1973).

Indeed, invasions of privacy and public disclosure of private facts torts are considered intentional torts for the purposes of applying *Calder*. The Third Circuit in *Hasson* itself applied *Calder* to claims of an invasion of privacy, *Hasson*, 114 F.4th at 187-188 (noting that the plaintiff asserted invasion of privacy claims), and numerous other courts have treated claims of public publication of private facts and related invasion of privacy torts as intentional torts warranting analysis under the *Calder* effects test. *See, e.g.*, *Tayts v. Gacutan*, No. 3:25-CV-03001-JSC, 2026 WL 125199, at *5 (N.D. Cal. Jan. 16, 2026) (analyzing claim of public disclosure of private facts under *Calder*); *Delong v. PHE, Inc*., No. CV 24-5212, 2025 WL 2447787, at *8 (E.D. Pa. Aug. 25, 2025) (analyzing intrusion of seclusion claim under *Calder*); *Hawks v. Seery*, No. CV-21-00092-PHX-DGC, 2023 WL 5206135, at *5 (D. Ariz. Aug. 14, 2023) (analyzing public disclosure of private facts under

12

Calder); *Espinosa v. Holloway*, No. 07 C 50009, 2007 WL 9821255, at *2 & n.2 (N.D. Ill. Sept. 28, 2007) (analyzing public disclosure of private facts under *Calder*).

### 2. Plaintiffs Felt the Harm in New Jersey

***Second***, Defendants' tortious out-of-state conduct causes harmful effects felt in New Jersey. As the Sixth Circuit recently held, when a defendant knowingly discloses personal information and understands that the resulting risk of harassment or violence will be experienced where the plaintiff resides, the "brunt of the harm" element of *Calder* is satisfied. *Johnson v. Griffin*, 85 F.4th 429, 433 (6th Cir. 2023). By continuing to disclose the protected information of New Jersey residents, Defendants continue to put a covered person at risk of violence or harassment in New Jersey. (*See* Compl. ¶¶ 2–3, 8–9, 15–24.)[5] And this risk of harassment, intimidation, or retaliation interferes with covered persons' ability to perform their duties as New Jersey public servants as well as with the state's ability to make public service safe. (*See* Compl. ¶¶ 2–3, 8–9, 15–24); *Atlas Data Priv. Corp. v. We Inform, LLC*, No. CV 24-4037, 2025 WL 2444153, at *2 (D.N.J. Aug. 25, 2025) ("Daniel's Law was enacted in 2020 and since amended to "enhance the safety and security of certain public officials in the justice system, including judicial officers, law

---

[5] Citations to "Compl." refer to the operative complaint filed in *Atlas Data Priv. Corp. v. Quantarium Alliance, LLC,* No. 1:24-cv-04098.

enforcement officers, child protective investigators in the Division of Child Protection and Permanency, and prosecutors.") (citing N.J.S.A. 56:8-166.3).

Moreover, the Defendants are data brokers and related businesses. Their trade is in the sale and distribution of information about people and their addresses and phone numbers. They know that this information affects individual's privacy and safety interests. Indeed (almost) every Defendant has extensive policies that purport to govern the privacy of the address and phone number information they publish. And there can be no doubt that they know that the publication of individuals' addresses and phone numbers affect those individuals where they live. Providing personal information about the location and phone numbers of their subjects is the very core of Defendants' businesses.

 It would be incredible for Defendants to assert that they do not know that they are affecting the privacy rights of individuals where they live. In this case, it would be incredible for Defendants to assert that they do not know that they are affecting the privacy rights of New Jersey residents and cause them harm in New Jersey.

Consider the facts of *Calder*.

The defendants were a reporter and editor based in Florida who wrote and approved an allegedly defamatory article about actress Shirley Jones. *Calder*, 465 U.S. at 784–85. Crucially, the court emphasized that the defendants knew Jones lived and worked in California, that her professional reputation was centered there,

14

and that the "brunt of the injury" from any defamatory publication would be suffered there. *Id.* at 788–89. The defendants' conduct was therefore not merely foreseeable in its effects; it was undertaken with knowledge that the injury would be experienced in California. The court explained that even though the defendants never traveled to California and performed their work entirely in Florida, they could reasonably anticipate being haled into a California court because they acted with full awareness of where the consequences of their conduct would land. *Id.* at 789–90.

Likewise, in *Johnson v. Griffin*, the court considered what the defendant knew about the plaintiff at the time of the intentional conduct. There, defendant Kathy Griffin, a California-based celebrity with approximately two million Twitter followers, used her social-media platform to launch a targeted campaign against Samuel Johnson, the CEO of VisuWell, a Tennessee-based company. *Johnson*, 85 F.4th 429 at 431. Griffin sent a series of tweets accusing Johnson of homophobic conduct and expressly encouraged her followers to make him "online famous." *Id.* She tagged VisuWell's corporate Twitter account and urged Johnson's employer to remove him from the company's Board of Directors. *Id.* In finding specific jurisdiction over Griffin, the court focused on what Griffin knew at the time she acted: Griffin knew Johnson's professional identity, knew where his employment was centered, and knew that any reputational and economic harm resulting from her tweets would be felt in Tennessee. *Id.* at 433.

15

In *Goldfarb v. Kalodimos*, the plaintiff was a physician affiliated with the University of Pennsylvania health system, whose medical practice and professional reputation were centered in Pennsylvania. 539 F. Supp. 3d 435 at 442. The defendants, who lived outside Pennsylvania, published false and damaging statements about the plaintiff online. *Id.* The defendants knew exactly who the plaintiff was and where his professional life was centered. *Id.* at 453. Their statements targeted the plaintiff's conduct as a physician and directly implicated his role within the University of Pennsylvania medical community. *Id.* Because of that affiliation, the defendants understood that any reputational or professional harm would occur in Pennsylvania, where the plaintiff treated patients and maintained his practice. *Id.* at 454. The defendants therefore knew, at the time they published the statements, that the "focal point of the harm" would be Pennsylvania, even though the statements were accessible online nationwide and the defendants themselves resided elsewhere. *Id.* at 454 & n. 8.

The same analysis applied in *Briskin v. Shopify, Inc*. The plaintiff, Briskin, a California resident, filed a putative class action against Shopify, Inc., a Canadian corporation, and its U.S. subsidiaries, Shopify (USA), Inc. and Shopify Payments (USA), Inc. *Briskin*, 135 F.4th 739 at 746. Briskin alleged that Shopify violated various California privacy and consumer protection laws by installing tracking cookies on his device without his knowledge or consent during an online purchase.

16

*Id.* at 747. These cookies allegedly tracked his location and online activity, and Shopify used the collected data to create consumer profiles, which it marketed to third parties, including California merchants. *Id.* at 747–48. In finding specific personal jurisdiction, the court focused on the facts that (1) Shopify conceded that its geolocation technology allowed it to know that Briskin's device was located in California when it installed cookies on Briskin's device; and (2) the complaint alleged that Shopify used the data gathered by its cookies to compile consumer profiles and sell them without the consumer's knowledge or consent. *Id.* at 745.

Thus, upon receiving a non-disclosure request from a New Jersey-based covered person, Defendants knew that Plaintiffs "would suffer the brunt of the harm caused by the tortious conduct *in the forum*." *Hasson*, 114 F.4th at 196 (quoting *Marten v. Godwin*, 499 F.3d 290, 298 (3d Cir. 2007)).

### 3. Defendants Expressly Aimed Their Conduct at New Jersey

***Third***, Defendants' "expressly aimed" their conduct at New Jersey by disclosing or continuing to disclose protected information that they knew concerned New Jersey residents. Courts routinely find express aiming where an out-of-state defendant knowingly publishes or disseminates harmful information about forum residents, even where the defendant has no physical presence in the forum. *See Goldfarb v. Kalodimos*, 539 F. Supp. 3d 435, 453–54 (E.D. Pa. 2021) (finding

17

express aiming satisfied where out-of-state defendant knowingly published harmful material about Pennsylvania resident, causing harm felt in Pennsylvania).

Here, Defendants know that they publish information about New Jersey because the location is the very content that Defendants convey in violation of the law. This is not a case of disseminating non-geographic information that is defamatory or even improper. The very information that is being wrongfully disclosed *is that it is in New Jersey*. There could be no more express aiming than that.

That is the same reason courts have found express aiming in analogous cases. In *Calder*, the defendants' article expressly identified facts about the plaintiff's life and career in California, making California part of the story itself—not merely the place where consequences were later felt. In *Johnson v. Griffin*, Kathy Griffin's tweets did not merely criticize an individual; they identified his employer and professional role, tying the speech to the specific place where his employment existed. In *Goldfarb v. Kalodimos*, the defendants' statements targeted a physician's professional conduct at the University of Pennsylvania, embedding Pennsylvania into the content of the publication. And in *Briskin v. Shopify, Inc.*, Shopify's data collection was not geographically neutral: the content of the data itself identified where the transaction occurred, such that Shopify knew it was collecting information tied to California at the moment of collection.

18

Further, Defendants know that the controverted publications concern New Jersey because the law requires that they receive notice to be liable for the subsequent publication. Defendants cannot be liable under Daniel's Law without notice that continued disclosure violates the rights of covered persons in New Jersey under New Jersey law. *See* N.J.S.A. 56:8-166.1(a)(1). By continuing to disclose the information regardless, Defendants purposefully direct their tortious conduct at the forum state. (*See* Compl. ¶¶ 37–40, 43.); *see, e.g.*, *Johnson v. Griffin*, 85 F.4th 429, 433 (6th Cir. 2023); *Goldfarb*, 539 F. Supp. 3d 435 at 453–54.

The notice procedure under Daniel's Law distinguishes these cases from *Hasson*. In *Hasson*, Papa John's used its website to deploy code onto users' browsers that collected their geolocation data. The Third Circuit affirmed dismissal of wiretapping claims against Papa John's because Papa John's only learned that the location data belonged to forum residents *after* the allegedly tortious collection. *Hasson*, 114 F.4th at 192. Here, by contrast, Defendants had notice. Defendants *knew* that the information concerned New Jersey residents before Defendants continued to disclose the information. *See Hasson*, 114 F.4th at 196.

This tortious conduct was also directed at the forum in other ways. As Defendants' corporate representatives testified, Defendants either collected or solicited data on New Jersey residents, often drawn from New Jersey public records. *See infra* at Sec. II.A-C. Unlike in *Hassan*, Defendants know *ex ante* that the data

19

they sell concerns New Jersey.  Defendants sell or furnish this data to customers or users primarily in New Jersey.  (*See* Compl. ¶¶ 2, 37–41, 43, 54–55.); *Schnur v. JetBlue Airways Corp.*, 2024 WL 2816552, at *5–6 (W.D. Pa. June 3, 2024); *Massie v. Gen. Motors Co.*, 2021 WL 2142728, at *5 (E.D. Cal. May 26, 2021).  Moreover, the *Hasson* court recognized that "courts have found express aiming where . . . the website is 'targeted at a particular jurisdiction,'" which "can be evidenced by content bearing a particular nexus to that forum or location-specific advertisements." *Hasson*, 114 F.4th at 190.

## II.   DEFENDANT-SPECIFIC JURISDICTIONAL SHOWINGS

### A. Melissa Data[6]

#### 1.   Jurisdiction Exists Under the Traditional Purposeful-Availment Test

Melissa Data satisfies the traditional test for specific jurisdiction.   The testimony confirms that Melissa Data has "minimum contacts with the forum state that show the defendant took a deliberate act reaching out to do business in that state" and that "give rise to—or relate to—the plaintiff's claims." *Hepp v. Facebook*, 14 F.4th 204, 207 (3d Cir. 2021).

Melissa Data operates a website, www.melissa.com, through which it sells multiple interactive, commercial products—including Melissa Lookups, Web

---

[6] Attached as Exhibit B to the Merejo declaration are the relevant excerpts from the deposition of John Melissa Jr. ("Melissa Dep.").  John Melissa Jr. is the 30(b)(6) witness designated by Melissa Data Corporation ("Melissa Data").

Services, Data List Services, and Data Append products—that make available New Jersey residents' home addresses and telephone numbers. *See, e.g.,* Melissa Dep. 74:2–76:19. Melissa offers paid products. *See, e.g*., Melissa Dep. 81:12–83:17 (noting that even its "free-tier" level costs $4.97). These products are sold and made available directly on Melissa Data's website, which is available to New Jersey customers.

Melissa admitted that the products sold on its website explicitly return address and phone number data for New Jersey residents. Melissa Dep. 52:8–11; 52:23–53:12; 54:9–11; 57:22–58:7; 59:22–60:4. In other words, the home address and/or phone number information concerning New Jersey residents is on Melissa's website. Offering forum-specific data products to forum residents constitutes purposeful availment. *Toys "R" Us*, 318 F.3d at 451–52.

Melissa Data also intentionally acquires New Jersey consumer data—including data on approximately 5.2 million New Jersey households—from multiple data providers such as Epsilon Data Management, Acxiom, New Star Data Services, and Black Knight. Melissa Dep. 118:25–119:12; 120:20–23; 121:13–21; 123:3–5; 123:10–18; 123:24–25.

Melissa Data also sells this New Jersey data (on its website) to New Jersey customers. Melissa Data knowingly targeted and served New Jersey customers at scale. Melissa Data directly marketed into New Jersey, mailing 35 physical catalogs

and sending 3,865 electronic catalogs to persons associated with New Jersey addresses, and contracting with New Jersey-based marketing partners (including Information Today/UniSphere Media in New Jersey) to distribute its materials. Melissa Dep. 128:23–129:7; 129:15–130:4; 132:9–15; 132:20–133:18; 138:9–11; 138:20–139:3. This forum-directed advertising is classic evidence of purposeful availment. *Hasson*, 114 F.4th at 190.

And Melissa Data's marketing efforts were successful. Between December 1, 2023, and April 30, 2025, Melissa Data acquired:

- 701 users with New Jersey addresses using Lookups services,

- 62 New Jersey users purchasing paid credits,

- 19 New Jersey web-services subscribers,

- 52 New Jersey purchasers of data lists, and

- 20 New Jersey purchasers of data-append services.

Melissa Dep. 80:19–23; 81:14–25; 84:16–21; 86:19–23; 87:21–23. These figures reflect sustained commercial relationships with New Jersey residents, not isolated contacts. *Burger King*, 471 U.S. at 476. From these New Jersey customers, Melissa Data derived substantial revenue generating approximately $2.1 million in sales to customers with New Jersey billing addresses. Melissa Dep. 154:13–17; 155:1–4. Treating New Jersey as a distinct revenue-producing market satisfies minimum contacts. *Ford*, 592 U.S. at 365.

22

Here, Melissa Data chose to target, market, obtain, and sell New Jersey home addresses and/or phone numbers to New Jersey customers. These contacts reflect deliberate exploitation of the New Jersey market, not random or fortuitous contact. *See, e.g.*, *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 452 (3d Cir. 2003) (If a web site operator "knowingly conducts business with forum state residents via the site, then the 'purposeful availment' requirement is satisfied.").

Plaintiffs' Daniel's Law claims arise out of and relate to these forum contacts because they challenge Melissa Data's collection, sale, marketing, and sale of New Jersey residents' home addresses and phone numbers after receipt of a nondisclosure request under Daniel's Law. *Ford*, 592 U.S. at 363. Accordingly, Melissa Data purposefully availed itself of the privilege of conducting activities in New Jersey and reasonably should have anticipated being haled into court there. *Burger King Corp.*, 471 U.S. 462 at 474–76; *Toys "R" Us, Inc.*, 318 F.3d 446 at 451–52.

### 2. Jurisdiction Exists Under the Calder Effects Test

#### i. Melissa Data Acted Intentionally

Melissa Data operates multiple brands and services, including Melissa Lookups, Melissa Direct, Web Services, Data List Services, and Data Append products, that affirmatively make available individuals' home addresses and telephone numbers, including for New Jersey residents. Melissa Dep. 52:8–11; 52:23–53:12; 53:14–18; 54:9–11. These services do not passively host third-party

content; they are designed to return address and phone number information in response to user queries and to sell lists and append services for direct marketing and other uses.  Dep. 41:24–42:10; 43:3–16; 43:25–44:8; 63:25–64:16; 70:7–13; 72:4–11.

Melissa Data intentionally acquires nationwide consumer data—including data from approximately 5.2 million New Jersey households—from multiple data providers such as Epsilon Data Management, Acxiom, New Star Data Services, and Black Knight.  Melissa Dep. 118:25–119:12; 120:20–23; 121:13–21; 123:3–5; 123:10–18; 123:24–25.  Melissa Data further runs searches across its datasets to identify and fill "holes" in address-level data, including geolocation fields, confirming active, intentional data processing rather than incidental storage.  Melissa Dep. 110:11–19.

This conduct satisfies *Calder*'s intentional-act requirement.  Jurisdiction over an out-of-state defendant "must be based on intentional conduct by the defendant that creates the necessary contacts with the forum."  *Walden*, 571 U.S. 277 at 286. Like the defendants in *Briskin*, Melissa Data knowingly collects, processes, and monetizes location-linked personal data, rendering its conduct deliberate.  *Briskin*, 135 F.4th 739 757–60.

24

### ii. *Melissa Data Knew the Plaintiffs Felt the Brunt of the Harm in New Jersey*

Melissa Data knew that the harm from its conduct would be felt in New Jersey. Melissa Data is familiar with Daniel's Law, understands why it was enacted, and recognizes that the disclosure of home addresses can lead to serious safety risks, including threats and violence against judicial officers and their families in New Jersey. Melissa Dep. 30:6–31:3; 31:8–15. Melissa Data's witness specifically acknowledged that such harms arise from online searches revealing home addresses. Melissa Dep. 30:6–31:3.

Melissa Data also maintains state-specific privacy notices, including one for New Jersey, reflecting its knowledge that New Jersey residents' privacy rights are implicated by its data practices. Melissa Dep. 147:4–5; 147:21–148:9; 149:13–23. Where a defendant knowingly publishes or distributes forum residents' personal information, the "brunt of the harm" is felt where those residents live. *Calder*, 465 U.S. 783 at 788–89; *Johnson*, 85 F.4th 429 at 433–34.

Because Melissa Data knowingly makes available New Jersey residents' home addresses and phone numbers and understands the risks associated with such disclosures, it necessarily knows that the resulting privacy and safety harms occur in New Jersey. This satisfies the second prong of Calder. *Hasson*, 114 F.4th 181 at 196.

25

### iii.  Melissa Data Admits it Expressly Aimed its Conduct at New Jersey

Melissa Data expressly aimed its conduct at New Jersey in multiple ways.

First, Melissa Data's products allow users to obtain home addresses and telephone numbers for New Jersey residents across numerous services, including Personator, All-in-One Lookup, Address Check, Property Information, Listware Online, and multiple Web Services and Data Append offerings.  Melissa Dep. 52:8–11; 52:23–53:12; 54:9–11; 54:19–21; 57:22–58:7; 59:22–60:4.  Where the content of the publication itself identifies the forum, express aiming is satisfied.  *Calder*, 465 U.S. at 788–89; *Goldfarb*, 539 F. Supp. 3d 435 at 453–54.

Second, Melissa Data knowingly sold and marketed its services to New Jersey residents and entities.  Between December 1, 2023, and April 30, 2025, Melissa Data had 701 Lookups users with New Jersey addresses, including 62 users who purchased credits beyond the free tier, 19 New Jersey subscribers to web services, 52 New Jersey purchasers of data lists, and 20 New Jersey purchasers of data append services.    Melissa  Dep.  80:19–23;  81:14–25;  84:16–21;  86:19–23;  87:21–23.  Deriving forum-specific revenue from the challenged conduct reinforces express aiming.  *Ford Motor*, 592 U.S. 351 at 365.

Third, Melissa Data directly marketed to New Jersey by sending 35 physical catalogs and 3,865 electronic catalogs to persons associated with New Jersey addresses during the same period.  Melissa Dep. 128:23–129:7; 129:15–130:4.

26

Melissa Data also contracted with New Jersey-based marketing partners, including Information Today/UniSphere Media in New Providence, New Jersey, to distribute its materials to New Jersey recipients.   Melissa Dep. 132:9–15; 132:20–133:18; 138:9–11; 138:20–139:3.

Finally, Melissa Data knowingly derived approximately $2.1 million in revenue from customers with New Jersey billing addresses.   Melissa Dep. 154:13–17; 155:1–4.   Courts routinely find express aiming where a defendant treats the forum as a distinct commercial market and derives substantial revenue from it. *Briskin*, 135 F.4th at 757 (quoting *Mavrix Photo, Inc*., 647 F.3d 1218 at 1230).

Taken together, Melissa Data's forum-specific data products, targeted marketing, and New Jersey-derived revenue establish express aiming under *Calder*. *Hasson*, 114 F.4th at 196.

## B. Equimine[7]

### 1. Jurisdiction Exists Under the Traditional Purposeful-Availment Test

Equimine satisfies the traditional test for specific jurisdiction.   The testimony confirms that Equimine has "minimum contacts with the forum state that show the defendant took a deliberate act reaching out to do business in that state" and that

---

[7] Attached as Exhibit C to the Merejo declaration are the relevant excerpts from the deposition of Brian Tepfer ("Tepfer Dep.").   Brian Tepfer is the 30(b)(6) witness designated by Equimine, Inc. d/b/a PropStream. ("Equimine").

27

"give rise to—or relate to—the plaintiff's claims." *Hepp v. Facebook*, 14 F.4th 204, 207 (3d Cir. 2021).

Equimine operates an interactive, subscription-based website, www.propstream.com, that sells products through which customers obtain home addresses, along with the associated names, of New Jersey residents.  Tepfer Dep. 36:4–8; 40:5–9; 52:8–9; 54:20–55:4; 55:7–12; 55:20–23; 62:13–16; 63:6–10.  In other words, the home address and/or phone number information concerning New Jersey residents is on Equimine's website.  Via these products, users can conduct granular searches via this subscription for New Jersey home address data, including county-level searches (e.g., Camden County) filtered by property attributes.

Users have to log in to the website and pay money to subscribe to these products and obtain home address and/or phone information; these products are not free.  Tepfer Dep. 36:22–37:8.  These products, which are branded under the name "Propstream," are sold directly via Equimine's website, which is available to New Jersey customers.  Tepfer Dep. 36:4-21.  Where, as here, defendant operates interactive tools that return forum-specific results, courts have weighed such facts in support of finding specific personal jurisdiction. *See Toys "R" Us*, 318 F.3d at 451.

Equimine intentionally acquired and stored massive quantities of data on New Jersey residents.  Its database includes approximately ***3.2 million*** New Jersey parcels, each represented as a database entry sourced from First American and stored

28

in Equimine's own systems.   Tepfer Dep. 55:20–23; 113:17–25.   Purposeful acquisition and retention of forum-specific data constitute minimum contacts. *Hasson*, 114 F.4th at 193.  Equimine affirmatively chose to include New Jersey data as part of its nationwide dataset acquired from First American because, by its own admission, the platform would be "remiss in value" without comprehensive coverage of all states, including New Jersey.  Tepfer Dep. 99:25–100:22; 101:3–12. Purposeful inclusion of forum data to enhance product value weighs in favor of satisfying minimum contacts.  *Ford*, 592 U.S. at 365.

Equimine also targeted and served New Jersey customers.   Equimine identified approximately 1,200 subscribers with New Jersey billing addresses, and Equimine admitted that it has customers in New Jersey and does not exclude New Jersey residents from subscribing.  Tepfer Dep. 109:12–14; 109:19–22; 111:17–22. Repeated commercial relationships with forum residents establish purposeful availment.  *Burger King*, 471 U.S. at 475–76; *see also Toys "R" Us*, 318 F.3d at 451 ("If a defendant web site operator intentionally targets the site to the forum state, and/or knowingly conducts business with forum state residents via the site, then the 'purposeful availment' requirement is satisfied.").

Plaintiffs' Daniel's Law claims arise directly out of and relate to these contacts, as they challenge Equimine's continued purchase, storage, marketing, and sale of New Jersey home address information, along with the associated names, after

29

receipt of a nondisclosure request under Daniel's Law.  The claims are therefore sufficiently related to Equimine's New Jersey activities to support jurisdiction. *Ford*, 592 U.S. at 363.  Where a defendant "systematically served a market in the forum State for the very product that the plaintiffs allege injured them," purposeful availment is satisfied.  *Id*. at 365; *Hasson*, 114 F.4th at 193.

Accordingly, Equimine purposefully availed itself of the privilege of conducting business in New Jersey and reasonably should have anticipated being haled into court there.  *Burger King Corp.*, 471 U.S. 462 at 474–76; *Toys "R" Us, Inc.*, 318 F.3d 446 at 451–52.

### 2.  Jurisdiction Exists Under the *Calder* Effects Test

#### i.  *Equimine Acted Intentionally*

Equimine's conduct is intentional.  Equimine operates PropStream, a nationwide property-data platform that affirmatively collects, aggregates, and publishes public-record property information through a searchable database.  Tepfer Dep. 36:4–8; 40:5–9.  Equimine intentionally acquires nationwide public-record data from First American, including New Jersey parcel data, and stores that information in its own database for use by subscribers.  Tepfer Dep. 52:8–9; 54:20–55:4; 55:7–12; 55:20–23.  Equimine admits that its database includes approximately 3.2 million New Jersey parcels, each represented by a database entry.  Tepfer Dep. 55:20–23; 113:17–25.  Through PropStream, users can use filters to search this

nationwide property-record database and return lists of property addresses that meet their selected criteria.  Tepfer Dep. 62:13–16; 63:6–10.

This is deliberate conduct, not passive availability.  Jurisdiction over an out-of-state defendant "must be based on intentional conduct by the defendant that creates the necessary contacts with the forum." *Walden*, 571 U.S. 277 at 286.  Like the defendants in *Briskin*, Equimine knowingly deployed a platform that collects and disseminates location-specific data, rendering its conduct intentional for *Calder* purposes.  *Briskin*, 135 F.4th 739 at 757–60.

> ii. *Equimine Knew the Plaintiffs Felt the Brunt of the Harm in New Jersey*

Equimine's witness testified that he is familiar with Daniel's Law, understands why it was enacted, and recognizes that it exists to protect covered persons by redacting or removing home address information to prevent harm.  Tepfer Dep. 15:17–16:6; 23:15–23.  The witness further acknowledged that "doxing" involves providing information about where someone is located, underscoring Equimine's awareness of the risks associated with publishing address-level data.  Tepfer Dep. 24:2–7.

Equimine admits that PropStream subscribers anywhere in the country can use the platform to look up New Jersey parcels and addresses, and that Equimine does not prevent New Jersey residents from subscribing.  Tepfer Dep. 111:3–8; 111:17–22.  When New Jersey residents' home addresses are displayed and searched

through PropStream, any resulting privacy invasion or safety risk is experienced where those residents live—in New Jersey.

Courts routinely hold that when a defendant knowingly publishes location-specific information about forum residents, the "brunt of the harm" is felt in the forum. *Calder*, 465 U.S. 783 at 788–89; *Johnson*, 85 F.4th 429 at 433–34. Because Equimine knew that its platform makes New Jersey addresses searchable and knew of Daniel's Law and the harms it seeks to prevent, the second *Calder* prong is satisfied. *Hasson*, 114 F.4th 181 at 196.

### iii.  *Equimine Expressly Aimed its Conduct at New Jersey*

Equimine expressly aimed its conduct at New Jersey.  First, PropStream allows users to run New Jersey-specific searches which returns lists of New Jersey addresses.  Tepfer Dep. 63:6–10.  Where the content of the search results themselves identifies the forum, express aiming is satisfied.  *Calder*, 465 U.S. at 788–89; *Goldfarb*, 539 F. Supp. 3d 435 at 453–54.

Second, Equimine intentionally acquired New Jersey data as part of its nationwide dataset, acknowledging that it does not exclude any state, including New Jersey, from the data it purchases because its platform depends on comprehensive, nationwide coverage.  Tepfer Dep. 99:25–100:22; 101:3–12.  Courts recognize express aiming where a defendant knowingly includes forum-specific data to serve

32

forum users.  *Briskin*, 135 F.4th at 757 (quoting *Mavrix Photo, Inc*., 647 F.3d 1218 at 1230.

Third, Equimine knowingly marketed and sold subscriptions to New Jersey customers.  PropStream identified approximately 1,200 subscribers with New Jersey billing addresses, and Equimine admitted that it has customers in New Jersey. Tepfer Dep. 109:12–14; 109:19–22.  Deriving forum-specific revenue from the challenged conduct reinforces express aiming.  *Ford Motor Co*., 592 U.S. 351 at 365.

Taken together, Equimine's New Jersey-specific data holdings, New Jersey-targeted search functionality, and substantial New Jersey subscriber base establish express aiming under *Calder*.  *Hasson*, 114 F.4th at 196.

## C. Innovative[8]

### 1. Jurisdiction Exists Under the Traditional Purposeful-Availment Test

Innovative satisfies the traditional test for specific jurisdiction.  The testimony confirms that Innovative has "minimum contacts with the forum state that show the defendant took a deliberate act reaching out to do business in that state" and that

---

[8] Attached as Exhibit D to the Merejo declaration are the relevant excerpts from the deposition of Wyatt Doolittle ("Doolittle Dep.").  Wyatt Doolittle is the 30(b)(6) witness designated by Innovative Web Solutions, LL ("Innovative").

"give rise to—or relate to—the plaintiff's claims." *Hepp v. Facebook*, 14 F.4th 204, 207 (3d Cir. 2021).

Innovative operates an interactive, commercial people search website, www.nationalcellulardirectory.com, that sells products through which customers obtain home addresses and phone numbers, along with the associated names, for New Jersey residents. Doolittle Dep. 33:18-36:2; 40:14-24. In other words, the home address and/or phone number information concerning New Jersey residents is on Innovative's website. Innovative offers paid products directly on Innovative's website, which is available to New Jersey customers. Doolittle Depo. 52:19-54:10.

Innovative purposefully collected and sold New Jersey residents' data as part of its product. Innovative admitted that its data sources—including Pipl, Tracers, and Versium—supply nationwide data that includes New Jersey residents' names, phone numbers, and home addresses, and that this information is displayed in reports sold to users. Doolittle Dep. 59:13–22; 61:18–22; 62:6–13; 62:18–20; 63:2–4.

Innovative also makes available its products to New Jersey residents. Innovative admitted that New Jersey residents can create accounts, run searches, and purchase reports, including reports containing names, phone numbers, addresses and family members. Doolittle Dep. 40:22–41:8; 52:12–18; 52:20–53:3; 54:22–55:10. For a premium price, users can obtain additional information like social media profiles and email addresses of New Jersey residents. *Id*. at 54:22–55:10. Such

purposeful acquisition and commercialization of forum-specific data constitutes minimum contacts. *Hasson*, 114 F.4th 181 at 193.

Additionally, Innovative repeatedly sold data to New Jersey customers. For calendar year 2024 alone, Innovative identified 499 active users with New Jersey ZIP codes associated with their credit cards, confirming repeated, intentional commercial transactions with New Jersey residents. Doolittle Dep. 43:12–16; 44:7–15; 45:2–3; 45:8–16. This is the type of "deliberate" reach into the forum that satisfies minimum contacts. *Burger King*, 471 U.S. at 475–76. This deliberate outreach to New Jersey residents resulted in direct benefit to Innovative in the form of company revenue. Innovative generated $35,103.31 in gross revenue from New Jersey residents in 2024 and expressly admitted that it "does derive revenue and profits from New Jersey residents." Doolittle Dep. 111:11–17; 111:25–112:11; 113:1–6. Deriving forum-specific revenue from the challenged conduct is a paradigmatic example of purposeful availment.[9] *Ford*, 592 U.S. at 363. These

---

[9] Innovative will surely argue that it conducts more transactions elsewhere. But that Courts within this District have already explained: "The point of assessing the number of transactions is to determine whether the business had knowledge of its interaction with residents of the foreign forum, or whether a few stray transactions happened to involve residents of the subject forum. In the absence of any other indication that the website owner knew of any transactions, the sheer number of transactions involving the subject forum can be compelling evidence. But that does not make the converse true, that a small number of sales is evidence of lack of intention. The question in all cases is whether the defendant deliberately made sales to the forum state." *Food Sci. Corp. v. Nagler*, Civil No. 09–1798 (JBS), 2010 WL 1186203, at *3 (D.N.J. Mar. 22, 2010).

35

activities reflect deliberate exploitation of New Jersey-sourced data and New Jersey residents as part of Innovative's business model.  Thus, these contacts evidence that Innovative "systematically served a market in [New Jersey] for the very [information] that the plaintiffs allege[]…injured them in" the forum.  *Hasson*, 114 F.4th at 193 (quoting *Ford Motor*, 592 U.S. at 365).

Plaintiffs' Daniel's Law claims arise out of and relate to these forum contacts because they challenge Innovative's collection, marketing, and sale of New Jersey residents' home addresses and phone numbers, after receipt of a nondisclosure request under Daniel's Law.  *Ford*, 592 U.S. at 363.  Accordingly, Innovative purposefully availed itself of the privilege of conducting activities in New Jersey and reasonably should have anticipated being haled into court there.  *Burger King Corp.*, 471 U.S. 462 at 474–76; *Toys "R" Us, Inc.*, 318 F.3d 446 at 451–52.

### 2.  Jurisdiction Exists Under the *Calder* Effects Test

#### i.  *Innovative Acted Intentionally*

Innovative's conduct is plainly intentional.  Innovative owns and operates the website nationalcellulardirectory.com, a people-search platform that affirmatively publishes individuals' names, phone numbers, home addresses, relatives, and related personal information.  Doolittle Dep. 31:13–19; 38:9–12; 38:21–39:7.  Innovative does not merely host third-party content; it deliberately aggregates, organizes, and

displays personal data in response to user searches, and monetizes that information by selling reports. Doolittle Dep. 52:20–53:3; 54:22–25; 54:25–55:10.

Innovative admits that its website is accessible to New Jersey residents and that it takes no steps to restrict access by geographic location. Doolittle Dep. 40:22–41:8; 52:12–18. Innovative further tracks user activity on its website, including searches performed, and can generate reports identifying users by state, including New Jersey. Doolittle Dep. 43:12–16; 44:7–15; 45:2–3; 45:8–16. For calendar year 2024 alone, Innovative identified 499 active users with New Jersey ZIP codes attached to their credit cards, confirming intentional, repeated interactions with New Jersey residents. Doolittle Dep. 45:8–16. Like the defendants in *Briskin*, Innovative knowingly deployed and monetized a system that collects and uses location-linked personal data, rendering its conduct deliberate rather than accidental. *Briskin*, 135 F.4th 739 at 757–60 (intentional data collection and monetization constitutes purposeful conduct where defendant knows the data is tied to forum residents).

Innovative also intentionally acquires and publishes data concerning New Jersey residents from multiple data brokers, including Pipl, Tracers, and Versium, all of which provide nationwide data that includes New Jersey residents. Doolittle Dep. 59:13–22; 61:18–22; 62:6–13; 62:18–20; 63:2–4. These deliberate acts of collection, publication, and monetization constitute intentional conduct for purposes of the Calder analysis.

37

> ## ii. *Innovative Knew the Plaintiffs Felt the Brunt of the Harm in New Jersey*

Innovative knew that the harm from its disclosures would be felt in New Jersey. Innovative is familiar with Daniel's Law and understands that nondisclosure requests concern protected information such as home addresses and unpublished telephone numbers of New Jersey covered persons. Doolittle Dep. 14:8–10; 16:15–20; 17:4–10. Innovative tracks and logs opt-out requests, including the state associated with each request, and can filter those requests to identify New Jersey residents specifically. Doolittle Dep. 92:7–9; 92:21–93:12.

Innovative further acknowledges that its reports display home addresses and phone numbers, and that publication of such information implicates individuals' privacy and safety interests where they live. Doolittle Dep. 49:6–16; 51:1–4. When New Jersey residents submit opt-out or nondisclosure requests, Innovative knows that the privacy invasion and resulting risk of harassment or harm is experienced in New Jersey. Doolittle Dep. 92:21–93:12.

Because Innovative continued to publish and monetize New Jersey residents' protected information with knowledge of their New Jersey residency and after receiving New Jersey-specific requests invoking Daniel's Law, Innovative necessarily knew that the brunt of the harm would be felt in New Jersey. That knowledge satisfies the second prong of *Calder*. Courts consistently hold that when a defendant knowingly discloses personal information tied to a forum resident, the

38

"brunt of the harm" is felt where that person resides.  *See Calder*, 465 U.S. at 789–90 (finding jurisdiction proper where defendants knew the plaintiff lived and worked in California and understood that any reputational harm from their publication would be felt there); *see also Johnson*, 85 F.4th at 433–34 (holding that defendant acted with knowledge that economic and reputational harm from her tweets would be suffered where the plaintiff's employment was located); *Goldfarb*, 539 F. Supp. 3d at 453–54 (finding jurisdiction proper where defendants knew the plaintiff practiced medicine in Pennsylvania and understood that professional harm would be felt there); *Briskin*, 135 F.4th at 759–60 (holding that defendant knowingly collected and used data tied to a California resident, with awareness that any privacy injury would occur in California).

> iii.  *Innovative Admits it Expressly Aimed its Conduct at New Jersey*

Innovative expressly aimed its conduct at New Jersey in multiple, independent ways.  Express aiming exists where a defendant knows, actually or constructively, that its conduct is directed at the forum.  *Briskin*, 135 F.4th at 757 (quoting *Mavrix Photo, Inc*., 647 F.3d 1218 at 1230).  First, Innovative knowingly tracked and analyzed user activity by state, ran reports specific to New Jersey ZIP codes, and confirmed hundreds of active New Jersey users over a defined period.  Doolittle Dep.

43:12–16; 44:7–15; 45:2–3; 45:8–16.  This is not passive nationwide availability; it is affirmative, forum-specific analysis and exploitation of New Jersey users.

Second, Innovative deliberately marketed its services nationwide, including New Jersey, through Google Ads and social-media channels such as Facebook and X (Twitter).    Doolittle Dep. 74:8–16;  99:19–100:2;  100:17–21;  101:1–18. Innovative confirmed that it does not exclude New Jersey residents from seeing its marketing materials and that its intent was to reach users in all states, including New Jersey.  Doolittle Dep. 74:8–16; 110:21–111:4.  Such location-agnostic advertising that intentionally reaches forum residents supports express aiming when combined with knowledge of forum-linked data.  *Hasson*, 114 F.4th at 190.

Third, Innovative affirmatively created and published New Jersey-specific content, including state-specific articles addressing New Jersey scam trends, which were then promoted on its social-media pages.  Doolittle Dep. 100:17–21; 101:1–18; 104:16–22; 106:17–24.  Where, as here, the content itself embeds the forum into the publication, express aiming is satisfied.  *Calder*, 465 U.S. at 788–89; *Goldfarb*, 539 F. Supp. 3d at 453–54.

Finally, Innovative knowingly derived revenue from New Jersey residents. Innovative's corporate representative testified that Innovative generated $35,103.31 in gross revenue from New Jersey for calendar year 2024, derived from all products and services offered by the company.  Doolittle Dep. 111:11–17; 111:25–112:11;

113:1–6.   Innovative expressly acknowledged that it "does derive revenue and profits from New Jersey residents."  Doolittle Dep. 113:1–6.

Taken together, these facts establish that Innovative knowingly and deliberately directed its conduct at New Jersey and New Jersey residents, satisfying the express-aiming requirement under *Calder*.

## III.   DEFENDANTS CANNOT SHOW THAT EXCERCISING JURISDICTION IS UNCONSTIUTIONAL

Under these facts, Defendants cannot demonstrate that exercising jurisdiction over these Defendants is "unconstitutional" or would violate notions of "fair play and substantial justice."  *Mellon Bank (E.) PSFS, Nat. Ass'n,* 960 F.2d 1217 at 1226 ("Once the plaintiff has made a prima facie case for personal jurisdiction based on minimum contacts, the burden falls upon the defendant to show that the assertion of jurisdiction is *unconstitutional*.") (emphasis in original).  Courts look at factors including the "forum state's interest, in adjudicating the dispute," "the plaintiff's interest in obtaining convenient and effective relief," and "the interstate juridical system's interest in obtaining the most efficient resolution of controversies and the shared interests of the several states in furthering fundamental substantive social policies."  *See e.g. Burger King,* 471 U.S. at 476-77.  Here, New Jersey has a strong interest in protecting its residents from the actions of out-of-state businesses that are felt in New Jersey.  New Jersey has also evinced a more specific interest in the kind

41

of injury at issue here by adopting Daniel's Law to protect its law enforcement officers, judges, and prosecutors from harm suffered by the disclosure of personal data.

The individuals affected by Defendants' conduct are all located in New Jersey. Moreover, the most efficient forum to adjudicate the controversy is New Jersey, which is familiar with Daniel's Law and where there are other similar cases pending in front of this very Court. Finally, and importantly, Defendants knowingly and intentionally bought and sold the home addresses and phone numbers of New Jersey residents, solicited and marketed their online service and products to New Jersey residents, and was aware about the New Jersey law that applied to disclosure of such information. Having chosen to profit from the dissemination of New Jersey-linked information—and having continued that conduct after receiving notice that it implicated New Jersey residents—Defendants cannot now claim that defending this action in New Jersey offends traditional notions of fair play or substantial justice.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court deny Defendants' Motions to Dismiss in its entirety.

Respectfully submitted,

Dated: 2/20/2026                     By: */s/ Rajiv D. Parikh*
                                     RAJIV D. PARIKH

**PEM LAW LLP**
Rajiv D. Parikh
Kathleen Barnett Einhorn
Jessica A. Merejo
1 Boland Dr., Suite 101
West Orange, New Jersey 07052
Telephone: (973) 557-5700
Email: rparikh@pemlawfirm.com
         keinhorn@pemlawfirm.com
         jmerejo@pemlawfirm.com


**BOIES SCHILLER FLEXNER LLP**
Adam Shaw (admitted *pro hac vice*)
30 South Pearl Street, 12th Floor
Albany, New York 12207
Telephone: (518) 434-0600
Email: ashaw@bsfllp.com

Mark C. Mao (admitted *pro hac vice*)
Julia Bront (admitted *pro hac vice*)
44 Montgomery Street, 41st Floor
San Francisco, California 94104
Telephone: (415) 293-6800
Email: mmao@bsfllp.com
         jbront@bsfllp.com

James Lee (admitted *pro hac vice*)
100 SE Second Street, Suite 2800
Miami, Florida 33131
Telephone: (305) 357-8434
Email: jlee@bsfllp.com

Eric Palmer (admitted *pro hac vice*)
401 E. Las Olas Blvd., Suite 1200
Fort Lauderdale, Florida 33301
Telephone: (954) 377-4250
Email: epalmer@bsfllp.com

*Attorneys for Plaintiffs*

43